James H. Carrigan, Appellee, v. Union Pacific Railroad Company, Appellant.

**MASTER AND SERVANT:** Place of Work—Servant Making Own Place—Choosing Unsuitable Material—Effect. The master cannot be said to be negligent when, to an experienced workman, he furnishes suitable and sufficient materials for the purpose of enabling the servant to make his own particular place in which to work, in his own manner, *and the servant deliberately or carelessly chooses unsafe or insecure materials instead of the safe and secure materials.*

PRINCIPLE APPLIED: Plaintiff was experienced in trucking goods into freight cars. When a car was in place for loading, there was an open space 16 inches wide between the bottom of the car door and the edge of the platform. Aprons of both wood and iron, and ample in number, size and make, were furnished by the master for the purpose of bridging this open space. One edge of the apron was placed on the doorsill and the other edge was placed on the platform; but, as the freight platform was some 8 or 10 inches lower than the doorsill, holes were supplied in the edge of the apron which rested on the platform, and in these holes, bolts were placed, both for the purpose of preventing the apron from slipping back from the doorsill and to furnish the workmen a "toe hold" in pushing trucks into the car. Bolts, ample in number and suitable for these two purposes, had been furnished by the master. Among those furnished, however, were some bolts which were flat headed and smooth, and which, while sufficient to hold the apron in place, afforded no sufficient "toe hold." Plaintiff, in preparing for loading, placed an iron apron in place, and dropped flat and smooth-headed bolts in the holes, instead of the bolts with projecting heads. He put in two bolts, but could have put in more. The doorsill was old and worn, and the apron, unknown to plaintiff, did not rest solidly thereon,

but wobbled. Plaintiff, by looking, might have discovered this wobbly condition and avoided it. He pushed a heavy load into the car, attempted to get a "toe hold" on the bolt, but failed, and was injured, by reason of the defective bolt and the wobbly condition of the apron. *Held*, negligence was wholly on the part of plaintiff, and not on the part of the master.

**NEGLIGENCE:** Contributory Negligence—Failure to Observe and 2 Avoid Danger—Unnecessary Use of Unsafe Materials. Where a master places an experienced workman in a reasonably safe place, and gives the servant control over the place and over the conduct of the business assigned to him in the place, and it becomes unsafe by reason of the careless manner in which the servant performs his work, any injury which proceeds from such condition of unsafety is to be ascribed to the negligence of the servant, and not to the master.

PRINCIPLE APPLIED: See No. 1.

*Appeal from Pottawattamie District Court.*—A. B. THOR-NELL, Judge.

SATURDAY, MAY 12, 1917.

ACTION to recover damages for personal injuries. Verdict and judgment for the plaintiff. Defendant appeals.—*Reversed.*

*Wright & Baldwin,* for appellant.

*Thomas Q. Harrison* and *Killpack & Northrop,* for appellee.

GAYNOR, C. J.—The plaintiff and the defendant were engaged in interstate commerce at the time of the happening of the matters complained of. Plaintiff brings this action to recover damages alleged to have been sustained through the negligence of the defendant, while so engaged.

1. MASTER AND SERVANT: place of work: servant making own place: choosing unsuitable material: effect.

The record discloses that plaintiff was what is known as a "storer." His duty was to take freight from a platform into freight cars placed alongside the platform. Trucks were used for this purpose. To accomplish this, the defendant had constructed a plat-

form about 2 blocks long and about 24 feet wide, running east and west. On the south side of this platform was a sidetrack, and on this, cars were placed to receive the goods ready for transportation. There were several "storers," and to each was assigned a certain number of cars to load. The freight was brought from some point to these cars, by what are known as "truckers," and left upon the trucks near the car into which it was to be loaded. The "storer" then picked up the truck, took it into the car, and stored it there.

Plaintiff had been engaged as storer for about a year at the same place, and had assigned to him approximately the same number of cars each morning. Every morning, the cars stood approximately at the same place. This morning he had 4 cars to load. The cars, we presume, were ordinary freight cars. The distance between the platform and the door of the car into which the goods were loaded was about 16 inches, and the sill of the car, the car in question, was approximately 8 or 10 inches higher than the platform. The space between the car and the platform had to be bridged over by iron aprons or running boards. These were furnished by defendant and distributed along the platform for use by the storers. Some were made of iron and some of wood. The one used by the plaintiff on this morning was an iron running board. These boards differed in size, from 3 feet by 3 feet to 2 ½ by 2 and 3 by 4. These running boards, or aprons, are placed over this space connecting the platform with the doorsill of the car by the storer, after the car has been spotted for loading. It was the duty of the storer to get these boards and place them in the car. This particular apron selected by the plaintiff and used that day was about 4 feet long and 3 feet wide. Bolts were furnished to hold the apron after it had been placed in position for use, and to keep it from slipping back from the door. These bolts were dropped into holes

in the apron next to the platform. They, too, were left on
the platform for that purpose. The storers used them; that
is, put them in through the holes in the iron apron to keep
the apron from slipping back. These iron aprons are full
of holes. The iron used in making them is taken from
around the fire boxes of the engines and, when removed,
these holes are there. It is a matter of choice with the storer
how many bolts he puts in. This particular morning but
two bolts were used, and those for the purpose of holding
the board from slipping back.

Plaintiff's evidence tends to show that he had been at
work as trucker for 7 or 8 years; had worked as storer for
about a year. This particular morning, he was assigned
several cars to load. He commenced working about half
past seven in the morning. The cars assigned him stood
practically where cars had previously stood during the time
of his service. Or, in other words, the cars this morning
stood practically in the same place with reference to the
platform. When cars were loaded, they were removed from
this sidetrack. Each morning, new cars were placed in
the same position that the other cars had occupied. The
foreman directed him what cars to load. This morning, the
first thing he did was to open the car doors, select his aprons
for use, and put them in the doorways of the cars assigned
to him. He did that this morning, and did that every morn-
ing. Did this without any direction from anyone. He
dropped the bolts in to keep the apron from slipping back,
two bolts in holes at the edge of the apron next to the plat-
form. These were all the bolts dropped in by him in this
particular apron. He testifies:

"The bolts so placed by me were put there to keep the
boards from slipping, and to get a toe hold with heavy
loads."

He had been engaged in loading these cars from about
7:30 in the morning until about 5:00 in the evening. He

was hurt about 5:00 P. M.  He had most of the cars loaded.
The particular load he was attempting to put into this car
at the time he was injured weighed about 800 pounds, and
was so heavy that, when he hit the board, his foot began
to slip.  He reached to get a toe hold and got his foot on
a bolt, gave a hard shove, and threw his weight over on his
right foot.  This threw his entire weight against the bolt.
This must have been the bolt near the west side of the run-
ning board or apron placed there to keep the board from
slipping back.  When he threw his weight on the right foot
and against this bolt, the board rocked and sprung down,
and threw him over and wrenched his ankle, and then, for
the first time, he discovered that the board was not level—
or rather, that the car door was not level; that the sill was
worn down in places and uneven; and that the bolt was
worn smooth.  He was thrown against the door of the car.

He testifies that there are two kinds of aprons, wooden
boards and steel boards; that wooden boards are larger
and more clumsy to handle, and it is hard to put a truck
over them into the car; that it is his duty, as storer, to
select the apron he desires to use and the bolts to keep it
from slipping; that this morning he chose this particular
apron; didn't put any bolts in except the bolts used to keep
the apron from slipping; that the car in question was next
to the last car that he was required to load; that he had
taken several loads into this car before he was injured;
that, at the time he was injured, he was halfway up the
board, when his foot slipped; that he reached back and felt
for and found the bolt, and the board rocked; that the bolt
turned around, his foot slipped out, and he turned his ankle.

He further testified that the storers remove the aprons
from the cars after they have finished loading, and leave
them on the platform, usually in front of the car in which
they were used; that, when occasion arose for using one
of the boards, he went to the car assigned him, and took

the apron and bolts lying in front of the car where they had been left the night before, whether he left them there or some other storer; that he had never used the bolts complained of before, or rather, that he had never before used the bolt on which his foot slipped; that he had used this particular apron before; had used it the day before; had put it in the morning before and used it all day; that, when he filled the car, he took it out and placed it on the platform, and found it there the next morning when he went to work, and used it again; that the bolts he used the day before were there, and were not worn off. In speaking of the bolts, he further testified:

"I just picked them up and dropped my board down; picked them up quick, stuck them in there, and then went on to load the car."

He was asked this question:

"You know a car sill has a flat strip of iron across it. A. Some of them do and some of them don't. The apron was not resting upon that flat strip of iron, but was resting on just the irregular edge of it. It was an old car, and one end of the strap was loose that went across the car door. This irregular edge was next to the edge of the apron."

It appears that there were six storers, each assigned approximately the same number of cars to load. Each of these storers used aprons and bolts gathered from the platform. The aprons and bolts were placed along the platform for the use of the storers. Each man selected and used aprons as he chose to use; selected the bolts, whether they used them for preventing the aprons from slipping, or whether they used them for toe holds. The evidence discloses that there were more of these running boards than were ever at one time in use, from which the storers might select; that the bolts are of different sizes, running from 4 to 10 inches in length, and from $\frac{1}{4}$ to 1 inch in thickness. They are placed in position along the platform, and there

were approximately 75 or 100 of them. There were approxi-
mately 25 extra running boards strung along the platform,
in addition to those in use on the cars. These were scat-
tered along the, whole length of the platform. There is
no evidence that there were not plenty of perfect bolts and
aprons that did not have the defects in them complained of
in this. There is affirmative evidence that there were
aprons that were reasonably proper for use. There is the
affirmative evidence of the plaintiff that the bolts he used
the day before in this same apron were there in front of
this same car, and were not defective. Conceding the bolts
used to be defective, he chose them of his own volition,
when, with the slightest inspection, he would have known,
if his contention is well founded, that their use rendered un-
safe the work which he had to do. With bolts there with
perfect heads, bolts that he had tried and found not want-
ing, he chose these smooth and, as he claimed, dangerous,
instrumentalities in preparing the place where he was re-
quired to work.

As to the apron, there is no claim that the apron in
and of itself was the proximate cause of any injury to this
plaintiff. The complaint is of the bolts and of the doorsill
of the car. It will be noted that he testifies that the door-
sill had an iron strip across it; that most of the cars had
these iron strips across the doorsills; that, when he placed
this apron, it did not rest upon that flat strip of iron, but
rested on just the irregular edge of it. It is not claimed
that it could not have been adjusted on this doorsill so as
to avoid tipping or "wobbling." He threw the apron down
without noticing where it rested, and found, after his in-
jury, that it was placed so as to rest on the irregular edge
of this strip of iron, thereby causing it to "wobble." He
does not claim that the doorsill was irregular all through.
The nearest approach to this is where he says the car sill
was worn down in places and uneven, but he does not say

how much it was worn down, nor the character of the wear
that rendered the doorsill defective. He does not say that
the apron could not be placed so as to avoid "wobbling."
The only place where he attempted to describe the doorsill
at all is where he says that the sill had a flat strip of iron
across it, with an irregular edge. The board was resting on
this irregular edge. The irregular edge was next to the
edge of the apron—that is, at the side of the apron.

Touching the bolts in question, it occurs readily to the
mind that, if anyone could know the danger of using bolts
with flat heads or with smooth tops, it would be the one
who had experience in the use of such bolts. Plaintiff had
been engaged in this work for over a year. He had selected
and used a great many of these bolts, though he says he
never had used this particular one before. If bolts with
flat heads were furnished for use generally and used by
these storers, it takes no stretch of imagination to reach
the conclusion that plaintiff had used flat or smooth bolts
before. He says that, when he selected his bolts, he did it
without observing the character of the bolt selected; that
he did this on this morning. If they had been furnished
and used generally, he must have known the danger that
attended their use, if they were dangerous at all. Yet he
selected these flat-headed bolts, placed them in the apron,
knowing at the time that it was dangerous, and knowing
at the same time that the company had furnished other
bolts, the use of which rendered his work reasonably safe.

2. NEGLIGENCE: contributory negligence; failure to observe and avoid danger: unnecessary use of unsafe materials.

The liability of the defendant is bottomed on the thought that it was the duty of the defendant to exercise reasonable care to see that the place furnished the plaintiff in which to do his work was reasonably safe. This rule is bottomed on the thought that
the servant is under the direction and control of the master.
The master selects the place in which the servant is required

to discharge his duties.   It becomes the duty of the master, therefore, as a matter of law, to see to it that the place selected for the servant is reasonably safe for the servant's use.   If, however, the place furnished by the master itself is reasonably safe, and it becomes unsafe by reason of the manner in which the servant conducts his work, the character of the place is not traceable to the failure of the master to discharge his duty, but to the negligence of the servant in the manner in which he discharges his duty.   Or, in other words, where a master places an experienced servant at work in a reasonably safe place, giving the servant control over the place, and over the conduct of the business assigned him in the place, and it becomes unsafe by reason of the careless manner in which the servant performs his work, any injury which proceeds from such condition of unsafety is to be ascribed to the negligence of the servant, and not to the master.   Negligence always presupposes a duty resting upon the one sought to be charged, not to do the particular thing against which the complaint is lodged, and the injury must be traceable to the failure to discharge the duty, as its proximate cause.

It is apparent from this record that the place in which plaintiff had been working for more than a year was a reasonably safe place in which to discharge the duties assigned to him.   Reasonably safe and simple appliances were furnished him with which to discharge his duties.   He was a man of large experience in that line of work.   He knew that, if he placed the apron so that it "wobbled," it would render the work in pushing heavy loads over the apron difficult and dangerous.   He knew that, if he placed these bolts in there for toe holds, a flat-headed bolt would not serve that purpose.   These are matters that a man without experience would know and appreciate; matters requiring no technical skill or knowledge to understand and appreciate.   He knew that, if he wanted to use those bolts for toe holds, he must

have bolts projecting above the surface of the aprons into which they were dropped. He selected bolts that would not serve this purpose, although he admits that there were bolts there that would. He knew—for it is a matter that anyone should know—that, if the end of the apron resting upon the car did not rest on an even surface, it was liable to tip; and yet he does not pretend to say to the jury that this board could not be placed on that sill so that it would not tip and "wobble." The sill was covered with an iron strip. True, it was loose at one end, and irregular. He placed the running board so that one side of that end rested on this irregular place, without stopping to look or see the effect of so doing.

The general rule is that it is the duty of the servant to use his senses in all that relates to his employment; to give attention and care to the selection of materials from the mass provided for general use; and to make provision, with reasonable diligence, for the safety of himself in his management of the work assigned him. Or, in other words, he is bound to bring his mind as well as his limbs into the service of his master, at least so far as it may be necessary to enable him to exercise a reasonable decree of care for his own safety.

These aprons and bolts were simply appliances or instrumentalities by means of which the plaintiff was to do his work. It was his duty to adjust them. It was his duty to place them in position for service and for his own use. The record discloses that reasonably safe instrumentalities were furnished for this purpose. From the mass, he must have selected that which would not serve the purpose he sought to accomplish by their use.

Two things must have been apparent to him at the time: (1) That a board laid on an uneven surface is liable to tip; (2) that a flat surface will not serve as a toe hold. By the slightest care, he could have adjusted this apron

over the sill of this car door so that it would not tip.  By
the slightest care, he could have procured bolts which would
serve as toe holds.  Both these duties to himself he neg-
lected.  The neglect of these duties was the proximate cause
of his injury.  It was not the duty of the master to super-
vise the manner in which he discharged these duties.  He
was an experienced workman.  The work was simple.  He
knew how to discharge it with safety to himself.  He neg-
lected to avail himself of the means open to him, and the
injury is the proximate result of such negligence.  He can-
not complain.  The court should have sustained the motion
for a directed verdict at the close of the evidence.  As sup-
porting these conclusions, see *Stourbridge v. Brooklyn City
R. Co.,* 41 N. Y. Supp. 128; *Whallon v. Sprague Elec. Elev.
Co.,* 37 N. Y. Supp. 174; *Flynn v. Maine Steamship Co.,* 35
N. Y. Supp. 1031.  This last named case involved the al-
leged negligence of the defendant in failing to place fenders
between the lighter and the vessel while plaintiff was un-
loading the cargo.  The court said:

" 'It is impossible that a master himself can control the
detail work.'  *  *  *  This injury arose from negligence
which was connected with the detail work.  'Such negligence
is not the negligence of the master, but is purely the negli-
gence of the coservant, and of this there is no possible
question.'  The evidence is overwhelming that proper appli-
ances were at hand and could have been used; and the fail-
ure to employ them is not negligence chargeable to the
master.  He did all the law reasonably required of him in
providing and having at hand, to be used, proper appliances;
and, as we have seen above, their non-use was negligence
consequent upon the detail work in which the plaintiff was
engaged, and was not the negligence of the master."

See also *Watts v. Beard,* 45 N. Y. Supp. 873; *Ross v.
Walker,* (Pa.) 21 Atl. 157.  This was an action to recover

damages for injury claimed to have resulted from the negligence of the defendant. The court said:

"After the workmen have been employed * * * and the work is actually entered upon, each workman is bound by the nature and terms of service to exercise reasonable care, diligence and skill in the performance of the work he has undertaken. * * * They must exercise their own senses in the selection of material out of the mass provided for them; they must use their own judgments as to the manner of handling it, as to the sufficiency and stability of the scaffolding they erect for themselves, and the amount of burden to be put upon such structures. No employer could have the burden of legal responsibility for every blunder or neglect on the part of each and all of his employees. * * * The master * * * is neither bound to provide the best tools and machinery nor the highest rate of skill in his foreman, but he is bound to provide that which is reasonably and sufficiently safe in both cases, and having done so, he has discharged his duty. What remains to be done is that each workman * * * shall, with reasonable diligence and intelligence, discharge his duty towards his employer and his fellows [and himself]."

It is further said:

"[The servants] were to judge of the suitability of the pieces of timber they used for the uses in which they put them, and their error in judgment, or their careless discharge of this duty, was their fault or failure, and not that of their employer. He had discharged his duty when he furnished an abundance of materials from which they could select what was needed. The actual selection out of this stock, of the sticks needed from time to time, was not his duty, but that of the workmen themselves. If there was a visible defect in a stick, prudence and common care on their part would have rejected it, and supplied its place with another out of the stock at their command."

See *Prescott v. Ball Engine Co.,* 176 Pa. St. 459 (53 Am. St. 683, 35 Atl. 224). In this case, a fellow servant selected an unsuitable rope from a supply containing suitable ones. or placed a suitable rope so as to be cut and weakened unnecessarily. The court held that the defendant was not liable.

In *Ross v. Walker,* 139 Pa. St. 42 (23 Am. St. 160, 21 Atl. 157), it is said that it is not the employer's duty, after having provided materials ample in quality and quantity, to supervise the selection of every article used by his employees out of the mass for their purpose.

*Judson v. Village of Olean,* 116 N. Y. 655. In this case, the plaintiff was injured by the falling of a scaffold insufficiently nailed by a fellow servant. No liability.

*Thompson v. Libbey,* 19 N. Y. Supp. 680. A fellow servant used too few spikes in building a scaffold, where there were plenty of them, or used carpenter planks too short, when there were planks long enough. Held that the injury was not due to any failure of the master to discharge any legal duty which he owed to the servant, but rather, due to the negligence of the servant.

These are a few cases which exemplify the rule which we have attempted to apply in this case.

The judgment is reversed and remanded, with directions to sustain defendant's motion to dismiss the case.— *Reversed and Remanded.*

LADD, EVANS and SALINGER, JJ., concur.